# THE UNITED STATES COURT OF APPEALS EIGHTH CIRCUIT

## No. 22-3457

---

## RIGHTCHOICE MANAGED CARE, et al.,

**Appellees**

**vs.**

## LABMED SERVICES, LLC, et al.,

**Appellants**

---

Appeal from the United States District Court
for the Western District of Missouri
Hon. David Gregory Kays, United States District Judge

---

# APPELLANTS' BRIEF

Oral Argument Requested

Joseph F. Yeckel
Yeckel Law Firm LLC
8909 Ladue Rd.
St. Louis, Missouri 63124
Telephone:  314-727-2430
Facsimile:  866-873-5905
Email:  joe@yeckel-law.com

Michael Gross
Michael Gross Law Office
6350 Clayton Rd., Unit 306
St. Louis, Missouri 63117
Telephone:  314-863-5887
Facsimile:  314-665-3040
Email:mgross@grossbriefs.com

*Attorneys for Appellants*

## SUMMARY OF THE CASE

Plaintiffs submitted claims against the Defendants for fraud, tortious interference with a contract, civil conspiracy, and money had and received based on their alleged role in a pass-through billing scheme involving Putnam County Memorial Hospital. The jury returned verdicts in favor of Plaintiffs and awarded punitive damages.

The District Court committed numerous errors. As a sanction, it barred the lead defense attorney from presenting closing argument, forcing the first chair attorney who had no prior experience giving a closing argument to prepare for and deliver the argument in a few days. The court erred in permitting Plaintiffs to admit a portion of the Missouri Auditor's report on Putnam. The evidence was unfairly prejudicial because it linked the Defendants to what the report described as "questionable laboratory billing practices." While the court instructed the jury to consider the evidence for non-hearsay purposes only, it had little or no relevance for any purpose but its truth. Defendants also challenge the submissibility of the claims for fraud and tortious interference with a contract. The appeal asserts instructional error with respect to an alternative fraud claim and further argues that the damages award on the claim for money had and received was excessive.

Appellants request that each side be granted 20 minutes for oral argument.

i

**CORPORATE DISCLOSURE STATEMENT**

SeroDynamics, LLC's parent company is Cadira Group Holdings, LLC. No publicly held company owns 10% or more of its stock, and it has no parent company that has issued shares to the public. LabMed Services, LLC has no parent company. No publicly held company owns 10% or more of its stock.

Appellate Case: 22-3457    Page: 3    Date Filed: 06/12/2023 Entry ID: 5285817

# TABLE OF CONTENTS

Summary of the Case .................................................................................i

Corporate Disclosure Statement ............................................................. ii

Table of Contents .................................................................................. iii

Table of Authorities ...............................................................................v

Jurisdictional Statement .........................................................................1

Issues Presented for Review ...................................................................3

Statement of the Case.............................................................................5

Summary of Argument ..........................................................................22

Argument...............................................................................................26

    I.     The District Court abused its discretion in disqualifying the appellants' lead counsel from delivering their closing arguments...26

    II.    The District Court erred in admitting portions of the Missouri Auditor's report. ...............................................................................37

    III.   The District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the fraud claims and in submitting those claims to the jury.....................................................50

    IV.   The District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the tortious interference with contract claims and in submitting those claims to the jury .............54

    V.   The District Court plainly erred in giving Plaintiffs' second alternative fraud instruction because the instruction grossly misstated Missouri law ....................................................................58

Appellate Case: 22-3457    Page: 4    Date Filed: 06/12/2023 Entry ID: 5285817

VI.    If the claims for fraud and tortious interference with a contract are reversed, the judgment on the civil conspiracy claims must also be reversed because those claims were predicated on liability for at least one of the other torts .........................................63

VII.   The District Court plainly erred in entering judgment for Plaintiffs on the claims for money had and received in the amount of $18,053,151 because such damages were excessive and were not supported by the evidence. .........................................65

VIII. If this Court reverses the judgment on tort claims that served as a predicate for the submission of punitive damage, the punitive damages award premised on those claims must be reversed. ..........68

Conclusion ........................................................................................69

Certificate of Compliance ................................................................70

Certificate of Filing and Service ......................................................70

iv

# TABLE OF AUTHORITIES

## Cases

*Adams v. Fuqua Indus., Inc.*,
   820 F.2d 271 (8th Cir. 1987)...............................................................49

*Bauer v. Curators of Univ. of Missouri*,
   680 F.3d 1043 (8th Cir. 2012)............................................................60

*Borchardt v. State Farm Fire & Cas. Co.*,
   931 F.3d 781 (8th Cir. 2019)....................................................... 50, 54

*Cent. Coal & Coke Co. v. Hartman*,
   111 F. 96 (8th Cir. 1901)..................................................................67

*City of New York v. Pullman Inc.*,
   662 F.2d 910 (2d Cir. 1981)...............................................................47

*City of Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) .........................................................................56

*Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*,
   796 S.W.2d 369 (Mo. 1990)...................................................... 3, 54, 56

*Coleman v. Home Depot, Inc.*,
   306 F.3d 1333 (3d Cir. 2002)...................................................... 42, 44

*Delgado v. Mitchell*,
   55 S.W.3d 508 (Mo. Ct. App. 2001) ......................................... 4, 24, 66

*Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*,
   299 F.3d 692 (8th Cir. 2002)...................................................... 4, 24, 64

*Dillon v. Nissan Motor Co., Ltd.*,
   986 F.2d 263 (8th Cir. 1993)....................................................... 26, 30

*Dindinger v. Allsteel, Inc.*,
   853 F.3d 414 (8th Cir. 2017)............................................. 3, 43, 45, 47

*Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   646 F.2d 1020 (5th Cir. 1981).............................................................31

v

*Emle Indus., Inc. v. Patentex, Inc.*,
  478 F.2d 562 (2d Cir. 1973)..............................................................30

*F.D.I.C. v. U.S. Fire Ins. Co.*,
  50 F.3d 1304 (5th Cir. 1995)..............................................................29

*Firemen's Fund Ins. Co. v. Thien*,
  63 F.3d 754 (8th Cir. 1995)..............................................................44

*Freeman v. Myers*,
  774 S.W.2d 892 (Mo. Ct. App. 1989)..............................................................52

*Gehl by Reed v. Soo Line R. Co.*,
  967 F.2d 1204 (8th Cir. 1992)..............................................................47

*Gen. Motors Corp. v. Harry Brown's, LLC*,
  563 F.3d 312 (8th Cir. 2009)..............................................................26

*Heberer v. Shell Oil Co.*,
  744 S.W.2d 441 (Mo. 1988)..............................................................3, 50

*Herring v. New York,*
  422 U.S. 853 (1975) .................................................... 3, 22, 27, 35

*Hervey v. Missouri Dep't of Corr.*,
  379 S.W.3d 156 (Mo. 2012)............................................. 4, 60, 61

*Hess v. Chase Manhattan Bank, USA, N.A.*,
  220 S.W.3d 758 (Mo. 2007)............................................. 4, 50, 51, 59, 60

*Hilderbrand v. Anderson*,
  270 S.W.2d 406 (Mo. Ct. App. 1954)..............................................................68

*Howard v. Youngman*,
  81 S.W.3d 101 (Mo. Ct. App. 2002)..............................................................56

*Johnson v. Yellow Freight Sys., Inc.*,
  734 F.2d 1304 (8th Cir. 1984)............................................. 3, 38, 42, 43, 46

*Karpierz v. Easley*,
  68 S.W.3d 565 (Mo. Ct. App. 2002)..............................................................66

vi

Appellate Case: 22-3457    Page: 7    Date Filed: 06/12/2023 Entry ID: 5285817

*Keefhaver v. Kimbrell*,
58 S.W.3d 54 (Mo. Ct. App. 2001)..........................................................61

*Kelly v. State Farm Mut. Auto. Ins. Co.*,
218 S.W.3d 517 (Mo. Ct. App. 2007).................................................. 4, 25, 68

*Koller v. Richardson-Merrell, Inc.*,
737 F.2d 1038 (D.C. Cir. 1984) ........................................................ 29, 31

*Krekelberg v. City of Minneapolis*,
991 F.3d 949 (8th Cir. 2021)........................................................... 37, 47

*Lowdermilk v. Vescovo Bldg. & Realty Co.*,
91 S.W.3d 617 (Mo. Ct. App. 2002)........................................................61

*Macheca Transp. Co. v. Philadelphia Indem. Co.*,
463 F.3d 827 (8th Cir. 2006)................................... 3, 22, 26, 29, 30, 35

*Melamed v. ITT Cont'l Baking Co.*,
592 F.2d 290 (6th Cir. 1979)..............................................................29

*Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*,
499 F. Supp. 3d 350 (W.D. Tex. 2020)................................................ 55, 56

*Oak Bluff Partners, Inc. v. Meyer*,
3 S.W.3d 777 (Mo. 1999)................................................................4, 63

*Olsen as Tr. for Xurex, Inc. v. Di Mase*,
24 F.4th 1197 (8th Cir. 2022)..............................................................58

*Quigley v. Winter*,
598 F.3d 938 (8th Cir. 2010)...............................................................58

*Robb v. Bond Purchase LLC*,
580 S.W.3d 70 (Mo. Ct. App. 2019).....................................................3, 54

*Simco v. Ellis*,
303 F.3d 929 (8th Cir. 2002)...............................................................65

*Spell v. McDaniel*,
824 F.2d 1380 (4th Cir. 1987).............................................................62

Appellate Case: 22-3457     Page: 8     Date Filed: 06/12/2023 Entry ID: 5285817

*Toben v. Bridgestone Retail Operations, LLC*,
   751 F.3d 888 (8th Cir. 2014) ................................................................ 4, 24, 65

*United States v. Adams*,
   722 F.3d 788 (6th Cir. 2013) ................................................................48

*United States v. Evans*,
   216 F.3d 80 (D.C. Cir. 2000) ................................................................48

*United States v. Reyes*,
   18 F.3d 65 (2d Cir. 1994) ................................................................ 43, 47, 49

*Variety Stores, Inc. v. Walmart Inc.*,
   852 F. App'x 711 (4th Cir. 2021) ................................................................62

*W. Blue Print Co., LLC v. Roberts*,
   367 S.W.3d 7 (Mo. 2012) ................................................................63

*Wagner v. Mortg. Info. Servs., Inc.*,
   261 S.W.3d 625 (Mo. Ct. App. 2008) ................................................................3, 52

*Ward v. Luck*,
   242 S.W.3d 473 (Mo. Ct. App. 2008) ................................................................65

*Williams v. Enochs*,
   742 S.W.2d 165 (Mo. 1987) ................................................................61

## **Statutes**

28 U.S.C. § 1291 ................................................................2

28 U.S.C. § 1331 ................................................................1

28 U.S.C. § 1367 ................................................................1

28 U.S.C. § 1927 ................................................................36

## **Rules**

Fed. R. Civ. P. 11 ................................................................36

Fed. R. Civ. P. 51 ................................................................58

Fed. R. Evid. 401 ................................................................43

Appellate Case: 22-3457    Page: 9    Date Filed: 06/12/2023 Entry ID: 5285817

Fed. R. Evid. 403 ................................................................. 43, 44, 45, 47

Fed. R. Evid. 803(8) ...................................................................42

Fed. R. App. P. 4(a)(1)(a) ............................................................1

**Other Authorities**

Wright & Mueller, 21A Fed. Prac. & Proc. Evid. § 5063.1 ........................... 44, 48

Anderson, *A Judge's Suggestions for Closing Argument: All of Your Hard Work Leads Up to the Most Important Part of Any Trial: The Closing Argument*, 13 No. 6 Prac. Litigator 47  (American Law Institute 2002) .............................27

Larsen, *Navigating the Federal Trial* § 12:55 (2022 ed.).......................................35

Restatement (Second) of Torts § 533 (1977)...........................................................52

Appellate Case: 22-3457    Page: 10    Date Filed: 06/12/2023 Entry ID: 5285817

# JURISDICTIONAL STATEMENT

## (i) Factual Information

Plaintiffs sued Mark Blake, Beau Gertz, SeroDynamics LLC, LabMed Services, LLC, SeroDynamics, LLC, and others. App.237; R. Doc. 310. A jury returned verdicts in favor of Plaintiffs for fraud, tortious interference with contract, conspiracy, and money had and received. App.1472-78; R. Doc. 751. The jury also awarded punitive damages against each Defendant. App.1585-86; R. Doc. 769.

The District Court entered judgment on September 30, 2021, and an amended judgment on October 27, 2022. App.1589; R. Doc. 772. The Court certified that the amended judgment was final for purposes of appeal pursuant to Fed. R. Civ. P. 54(b). App.1935; R. Doc. 828, at 2. Defendants filed their joint notice of appeal on November 25, 2022. App.1936; R. Doc. 830.

## (ii) Jurisdiction of the District Court

The District Court had jurisdiction under 28 U.S.C. § 1331 because the action presents a federal question. The District Court had supplement jurisdiction of the remaining claims asserted by Plaintiffs under Missouri law by virtue of 28 U.S.C. § 1367.

## (iii) Appellate Jurisdiction

A notice of appeal is timely if it is filed within 30 days after entry of the judgment or order appealed from. Fed.R.App.P. 4(a)(1)(a). The amended judgment

1

entered on October 27, 2022, is appealable under 28 U.S.C. § 1291, which vests the courts of appeals with jurisdiction of all appeals from final decisions of the district courts.

## ISSUES PRESENTED FOR REVIEW

I.       **Whether the District Court abused its discretion in disqualifying Defendants' lead defense counsel from delivering their closing argument.**

*Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827 (8th Cir. 2006)

*Herring v. New York,* 422 U.S. 853 (1975)

**II. Whether the District Court erred in admitting portions of the Missouri Auditor's report.**

*Johnson v. Yellow Freight Sys., Inc.*, 734 F.2d 1304 (8th Cir. 1984)

*Dindinger v. Allsteel, Inc.*, 853 F.3d 414 (8th Cir. 2017)

**III. Whether the District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the fraud claims.**

*Heberer v. Shell Oil Co.*, 744 S.W.2d 441 (Mo. 1988)

*Wagner v. Mortg. Info. Servs., Inc.*, 261 S.W.3d 625 (Mo. Ct. App. 2008)

**IV. Whether the District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the tortious interference with contract claims.**

*Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369 (Mo. 1990)

*Robb v. Bond Purchase LLC,* 580 S.W.3d 70 (Mo. Ct. App. 2019)

3

**V. Whether the District Court plainly erred in giving Plaintiffs' second alternative fraud instruction because the instruction misstated Missouri law.**

*Hervey v. Missouri Dep't of Corr.*, 379 S.W.3d 156 (Mo. 2012)

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758 (Mo. 2007)

**VI. Whether the judgment on the civil conspiracy claims must be reversed if the judgment for the predicate claims of fraud and tortious interference with contract are reversed.**

*Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777 (Mo. 1999)

*Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 700 (8th Cir. 2002)

**VII. Whether the District Court plainly erred in entering judgment for Plaintiffs on the claims for money had and received in the amount of $18,053,151 because the evidence did not support the award.**

*Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888 (8th Cir. 2014)

*Delgado v. Mitchell*, 55 S.W.3d 508 (Mo. Ct. App. 2001)

**VIII. Whether the punitive damage award must be reversed if the judgment for the predicate claims of fraud and tortious interference with contract are reversed.**

*Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517 (Mo. Ct. App. 2007)

Appellate Case: 22-3457    Page: 14    Date Filed: 06/12/2023 Entry ID: 5285817

# STATEMENT OF THE CASE[1]

## A. Introduction

Plaintiffs are health insurance companies: RightCHOICE Managed Care, Inc., and 24 other independent licensees or subsidiaries of independent licensees of the Blue Cross and Blue Shield Association. App.160; R. Doc. 310.[2] They sued Hospital Partners, Hospital Laboratory Partners, Empower, Pinnacle Laboratory Services, LabMed Services, SeroDynamics, David Byrns, Jorge Perez, James Porter, Beau Gertz, and Mark Blake. App.160; R. Doc. 310. Plaintiffs alleged that these individuals and entities were involved in a pass-through billing scheme. App.160; R. Doc. 310. Only Gertz, Blake, SeroDynamics, and LabMed defended at trial and have appealed.

According to Plaintiffs, the scheme entailed submitting claims for laboratory tests through Putnam County Memorial Hospital, which is in-network with BCBS, and making it appear that the tests were performed at the hospital when they were conducted elsewhere. Plaintiffs alleged that Putnam was used as a billing entity to

---

[1] The trial transcript is cited as "T[volume number]/[page numbers]." Appellants' Separate Appendix is cited as "App." Pages 1938 through 2002 and 2534 through 2956 of Appellants' Separate Appendix contain trial exhibits that are not electronically available on the District Court docket.

[2] Anthem is the parent company for the Blue Cross and Blue Shield plans. T1B/46; T3B/618. Anthem, Blue Cross and Blue Shield, and RightCHOICE were frequently referred to interchangeably during the trial. The plaintiffs are referred to collectively as Anthem from time to time in this brief.

5

exploit its in-network status and BCBS's favorable reimbursement rates. App.163; R. Doc. 310, at 4. Plaintiffs claimed that they reimbursed Putnam $89 million for laboratory tests and that most of the proceeds were distributed to various defendants. *Id*.

Plaintiffs asserted claims for fraud, tortious interference with a contract, civil conspiracy, and money had and received. App.160; R. Doc. 310. This appeal involves the judgment on the claims submitted against Mark Blake, Beau Gertz, SeroDynamics, and LabMed Services. Their defense was led through three years of pre-trial proceedings and preparation, and through the entirety of trial until closing argument, by attorney Gregory Minana. As a sanction at the close of evidence, the District Court disqualified Minana from closing argument. The Court ordered that one of the young attorneys who had assisted Minana deliver that summation. T5B/1128-29. The jury returned verdicts on each claim in favor of Plaintiffs, awarding them $18,053.015.00 as compensatory damages and $1,900,000.00 from each of the defendants as punitive damages. App.1472; R. Doc. 751;App.1584; R. Doc. 769.

### B. Statement of Facts and Procedural History

Blake and Gertz were the principal owners of SeroDynamics and LabMed Services. T2B/257; T3A/494-95. SeroDynamics was a clinical blood laboratory based in Colorado. T2B/257; T3A/516. LabMed Services provided consulting and

6

marketing services for SeroDynamics. T2B/258; T3A/445-46;App.1535; R. Doc. 760, at 18. All claims at issue in this appeal arose from tests performed by SeroDynamics. App.1536; R. Doc. 760, at 19.

In 2015 Blake and Gertz wanted to secure a reference lab agreement with a hospital that was in-network with a major insurance carrier. T2B/264-65. In-network hospitals are contractually authorized by an insurance company to provide care to covered individuals and to bill for covered services. T1B/83. Hospitals not equipped or staffed to perform tests may refer that work to reference labs. T/2A143; T5A/989.

Jorge Perez managed the Campbellton-Graceville Hospital in rural Florida. T2B/266. In early 2016 Perez contacted Blake and Gertz about SeroDynamics serving as a reference laboratory for his hospital. Gertz knew CGH was in-network with BCBS. T2B/278. In April 2016, SeroDynamics signed a contract with CGH. T2B/267; T3A/432. Under the agreement, SeroDynamics provided laboratory services and CGH billed insurance companies for those services. T2B/269-70; T3A/431. Empower, owned by Perez, submitted the claims to the insurers. T2B/311-12.

SeroDynamics began marketing its lab services to physicians around the country based on its relationship with CGH. T2B/290-95. SeroDynamics notified physicians that it could "provide comprehensive, high quality diagnostic services

for your practice and patients through our laboratory relationship with Campbellton-Graceville Hospital." T2B/294-95;App.1955. The announcement stated that laboratory services were covered in-network with several insurers, including Anthem and Blue Cross Blue Shield. *Id*.[3]

Jim Porter operated a urine toxicology lab and had a reference lab agreement with CGH. T2B/303. In August 2016, he notified Gertz that BCBS had frozen payments to CGH for work performed by his lab. T2B/304-05;App.2659. Porter forwarded a letter Florida Blue sent to hospitals regarding "billing of non-patient specimen urine test lab services." T3A/521;App.2663. The letter identified an "inappropriate billing practice regarding urine testing lab services for non-patient specimens" whereby "hospitals bill[ed] Florida Blue for services allegedly provided to members who actually sought such services from wholly separate, independent clinical laboratories that do not participate in any of Florida Blue's networks, and, as such, are not considered legitimate billing services." T2B/307;App.2663. The letter concluded: "In general, Florida Blue's participating provider agreements do not allow hospitals to bill Florida Blue for services actually rendered by a separate independent clinical laboratory at a location outside of the hospital." *Id*. Porter texted Gertz, "[W]hat do you think about that?" to

---

[3] The release was issued by Cadira Labs. Cadira Labs refers to all of Gertz's businesses, including SeroDynamics. T2B/268,294.

8

which Gertz replied: "A true business model is needed. We all saw that coming." T2B/308;App.2665-67.

In an email to Blake, Gertz expressed his view that Florida Blue's notice concerned urine testing would eventually "go systemic to blood and all carriers" and that they should be "prepared for a call on all the legalities." T2B/310. Blake emailed Gertz: "Although it applies only to toxicology, we should expect that hospital attorneys will apply this to blood." T/3A525. BCBS never issued a comparable notice regarding blood testing. T3B/608. In September 2016, however, Blake and Gertz learned that CGH stopped submitting claims for SeroDynamics' work. App.1957. At that time CGH owed SeroDynamics approximately $450,000. T3A/532.

SeroDynamics also served as a reference laboratory on similar terms for Southwest Labs. T2B/280; T3A/429-32. Southwest sent blood samples to SeroDynamics for testing, and Southwest paid SeroDynamics $300 per specimen. T3A/429,529. By the summer of 2016, Southwest had fallen behind in its payments and owed SeroDynamics approximately $2 million. T2B/333.

Putnam County Memorial Hospital is a 15-bed critical access hospital in Unionville, Missouri, a farming community about 8 miles south of the Iowa border. T1B/81. Putnam was in-network with several major insurance companies, including BCBS, CIGNA, Aetna, and United Health Care. T1B/83. Its contract

9

with BCBS set forth the terms and conditions Putnam was required to follow to participate in the provider network. T5A/899-900;App.2534-64. Section 4.1(b) of the contract stated: "Hospital shall bill only for Hospital Services performed by or under the direction and personal supervision of Hospital." App.2542. It defined "Hospital Services" as "those inpatient and outpatient services, products, accommodations, and care that are customarily provided or available at or available from Hospital." T4B/904-05;App.2535. Another provision required Putnam to submit "accurate, complete, and truthful" claims information. App.2542.

In January 2016, Putnam was in dire financial condition. T2A/177-78. Its CEO had left after accumulating significant debt, and the hospital was receiving demands from creditors. T1B/86; T2A/177-78. Its Board of Trustees was searching for a way to keep Putnam from closing. T2A/159,181-85. On July 1, 2016, Blessing Health System declined Putnam's overture to lease or purchase the hospital, concluding that Putnam "was not financially viable" and faced "serious, immediate financial challenges." T2A/184-85;App.2886.

Perez and David Byrns owned and operated Hospital Partners, Inc. T1B/88-89,93;App.1535; R. Doc. 760 at 18. The company specialized in rural hospital management. T1B/88-89. Luscan and Byrns scheduled a meeting to discuss Hospital Partners taking over the management of Putnam. T1B/88. Byrns and

10

Perez attended the board meeting on September 1, 2016. T2A/187. Arlene Pickens, the hospital's former director of nursing and new CEO, testified for Anthem: "They were portrayed as experts of saving rural hospitals, and they were there to help us keep the doors open." T1B/79-81,88.

Byrns told the board about his plan for saving Putnam. T1B/88; T2A/187. He explained that Hospital Partners would "add new services that will generate the revenue needed to sustain" Putnam. T1B/90;App.2889. One aspect of the plan was to transform the hospital's laboratory into a reference lab capable of performing 8,000 tests each month. T1B/90. At that time, Putnam's lab had seven machines, was staffed by three technicians, and was unable to perform many kinds of tests. T1B/91; T4A/781.

The board voted to approve a management agreement with Hospital Partners. T1B/94-95;App.2892. The agreement was signed on September 12, 2016. *Id*. Byrns became Putnam's CEO. T1B/92. Byrns retained Empower to provide medical billing services for the hospital, including the submission of claims to insurers. T1B/96-97; T3A/447.

Perez contacted Gertz and asked if SeroDynamics would serve as Putnam's reference laboratory for blood testing. T2B/313; T3A/436. Gertz and Byrns met at Putnam in October 2016. T2B/316. When Gertz inspected Putnam's lab, he found that it lacked the sophisticated blood testing equipment required by a reference

11

laboratory. T3A/437. He planned to use SeroDynamics as Putnam's reference laboratory until the hospital could build out its blood-testing capacity. T3A/437-38. Byrns spoke to hospital personnel about expanding Putnam's blood- and urine-testing capability, but the planning actually done by the hospital was limited to starting a urine-testing toxicology lab. T2A/219-20; T4A/783-84.

Gertz and Blake knew that Putnam was in-network with BCBS. T2B/316; T3A/498-500. Gertz testified that he requested a copy of the contract between Putnam and BCBS but none was ever provided. T3A/463,467. Blake was referred to Putnam's counsel when he requested access to the contract. T3A/499-502. He noted that the attorney previously had directed a Medicaid fraud unit in Florida and testified that he accepted the attorney's assurance that the relationship between SeroDynamics and Putnam was in compliance with the BCBS-Putnam contract. T3A/499-502.[4]

SeroDynamics and Putnam executed an reference lab agreement on November 1, 2016, with an effective date of August 23, 2016. T2B/322;App.2581-87. SeroDynamics provided reference laboratory services to Putnam and billed Putnam for its work. T2B/323; T3A/445. Putnam paid SeroDynamics a flat fee for

---

[4] Anthem acknowledged in its summary judgment papers that "[n]either Putnam nor Empower (or anyone else) provided a copy of the RightCHOICE Agreement to the Sero Defendants (until this litigation)." App.2287; R. Doc. 552, at 32.

each test. T3A/445. Depending on the insurer's adjudication rate, SeroDynamics would receive nothing, $300, or $450 per test. T3A/445.

The contract gave Putnam the exclusive right to bill insurers under its provider numbers and to collect for services provided under the agreement. T2B/324;App.2584. Putnam agreed that its claims billing practices would comply with "applicable laws, regulations, and third-party payer standards." App.2586. As part of the agreement, Putnam assumed patient billing and payment obligations for the unpaid CGH claims from the contract's effective date. T2B/332;App.2581. Byrns and Jorge Perez also agreed to assume responsibility for billing the unpaid Southwest claims through Putnam. T2B/359-60; T3A/533-34; T3B/562. Their agreement to bill the unpaid CGH and Southwest claims kept SeroDynamics in business. T2B/360.[5]

Putnam also entered an agreement with LabMed Services. T2B/320. Under that agreement, LabMed provided consulting and marketing services in connection with the blood testing services provided by SeroDynamics. T2B/258; T3A/446;App.2588. LabMed engaged marketers throughout the United States to promote SeroDynamics' lab services based on Putnam's in-network relationships

---

[5] Perez told Gertz that he expected compensation for rescuing SeroDynamics. T2B/367. In May 2017 Blake and Perez executed a marketing and shared services agreement whereby LabMed retained Empower as a consultant. App.2793. LabMed agreed to pay Empower 10 percent of its income beginning February 7, 2017. T2B/371-74;App.2793.

13

with insurers. T2B/375-77; T3B/566; T4B/858;App.1972. Marketers visited physician offices to solicit business and were paid based on the number of blood samples those providers sent to SeroDynamics. T2B/375; T3B/567. For these services Putnam paid LabMed 60 percent of the revenue associated with all accounts less the cost of providing the laboratory services plus $5,000 per month. T3B/565.

After a blood sample was collected in a physician's office, it was sent overnight to SeroDynamics. T3A/438,440;App.1536; R. Doc. 760, at 19. After the sample was tested, the results were entered in an electronic record system called LabTrac. T3A/441. The physician who ordered the test was given access to LabTrac to view the results. *Id*. Putnam and Empower also had the ability to access records in LabTrac. T3A/447-48; T3B/603;App.2893.

Empower submitted claims to RightCHOICE using Putnam's provider numbers. T3A/447-48,472,504; T3B/614; T5A/992. SeroDynamics sent Empower the patient and test information necessary to bill the claims. T3A/504; T5A/992. Blake and Gertz understood Empower would submit claims using Putnam's provider numbers. T3A/470,504. They did not have access to what was sent to insurance companies. T3A/448,455,466; T3B/611. Empower converted the information into a coded format recognizable to the software used by Anthem's claims system. T3B/661; T4B/962. Empower submitted every claim as an 837I,

which is the electronic version of a UB-04. T3A/447; T4B/962; T5A/992.[6] UB-04 is the paper form previously—and occasionally still—used to submit medical services claims. T3B/620.

Every claim submitted by Empower for a test performed by SeroDynamics contained a Type of Bill 141 code. T5A/1021-22. The coding system differentiates between tests done for individuals who are not hospital patients and those who are either hospital in-patients or outpatients. *Id.* Peter Kongstvedt MD, an expert witness for Anthem, said a Type of Bill 141 code "indicates that a patient is a non-patient." *Id*. Kongstvedt defined "inpatient" as an individual treated in the hospital for more than 24 hours and "outpatient" as an individual there for less than 24 hours. *Id*.

Anthem receives hundreds of millions of claims a year. T3B/622. It uses an automated system to process that volume of claims. T3B/622-23; T4B/961-62. This system, known as auto-adjudication, "process[es] the claim all by itself" without having "to stop the claim for someone to manually look at anything." T3B/622-23. Because Anthem's computers cannot assess the veracity of the claims data, auto-adjudication relies on providers to supply accurate information. T3B/624. When RightCHOICE received a claim from a hospital such as Putnam in

---

[6] A UB-04 is the form used by hospitals to submit a claim in paper format. App.2955. 837I is the electronic version of a UB-04. T3B/620; T4A/735; T5A/992. The terms were used interchangeably at trial.

15

electronic format consisting of a numbers and letters code, its computer read that data and "create[d] the UB-04 form and enter[ed] the data into the field of the UB-04 form." T4A/736.

The first piece of data the system examined was the provider numbers associated with the claim. T3B/625. If the provider was in-network, the reimbursable amount was determined based on the contractual fee schedule for the service rendered and the member's deductible, co-pay, and co-insurance. T3B/626-29; T4B/961-62. If the provider was out-of-network and the member had out-of-network benefits, the allowed amount was determined based on an enterprise out-of-network fee schedule and the member's cost share. T3B/631-32, T4B/961-62.

Carey Bobbitt, an Anthem claims employee, acknowledged that when RightCHOICE received a claim from Putnam it made an assumption that the claim was for services performed at the hospital. T3B/618-19,681-82. This was so even though every claim at issue here contained a Type of Bill 141 code indicating that the recipient was a nonpatient. T4A/752-56. Nancy Oser, who had retired as a "senior investigator in the special investigations unit" after 30 years' employment at Anthem, acknowledged that the Type of Bill 141 code told the insurers "that the test was not done by Putnam and the blood was not at Putnam." T4A/753-54.[7]

_____

[7] After having acknowledged that the Type of Bill 141 code informed RightCHOICE "that the test was not done by Putnam and the blood was not at Putnam," Oser testified on redirect examination: "A 141 indicates that it's an

16

Oser explained that Anthem's claims processing software converted the 141 code indicating service provided to a nonpatient into a Place of Service 22 code, indicating service provided to an outpatient. T4A/760-61. She testified that this was so even though a UB-04 has no field to indicate the place that service was provided. T3B/676-77. Anthem adjudicated every at-issue claim on its assumption that "Putnam did … the test," despite the inclusion of Type of Bill 141 code informing the company that the tests had been performed on individuals who were nonpatients. T4A/759-66.

Anthem paid Putnam $18,053,015 for blood tests performed by SeroDynamics. T5A/1053-56. It began investigating Putnam's billing practices after receiving reports that the hospital had submitted claims for distant testing. T4A/810-15. An internal report from January 2017 revealed that Anthem had paid Putnam $12 million for urine drug tests in the preceding six months. T4B/829-30. This represented a significant increase from Putnam's historical billing of $1 million annually. T4B/910.

The investigation was led by James Balcom, a senior Anthem fraud investigator. T4A/807, 815. On January 19, 2017, Balcom contacted Heather

---

outpatient—a nonpatient of the hospital and the blood should have been performed there." T4A/762. She stated: "And the whole thing with the 141 bill type is actually incorrect because billing on the UB was incorrect for these labs." T4A/761-62.

17

Burch, the manager responsible for Putnam's network contract. T4B/837-38;App.2745. He requested a copy of the contract "as it related to any and all lab work." App.2745. Burch replied that she was in the process of negotiating with Putnam and "moving them to our current contract template." App.2744.

On February 1, 2017, Balcom asked Burch whether Putnam's contract dealt with pass-through billing. App.2752.[8] Burch replied that Putnam "is on an old contract template" that "does not address pass through billing." T4B/846;App.2751. When Balcom asked whether Putnam could be held to the pass-through rule under those circumstances, Burch responded:

> Part of the reason we were negotiating with Putnam is to move the facility to our current contract template that addressed pass through billing. I don't feel that we can hold them to the pass through rule if it is silent in their current contract.

T4B/847;App.2751. Balcom never saw any written rules or guidelines issued by Anthem applicable to contracts that were silent on the issue of pass-through billing. T4B/882-86.

On March 1, 2017, Anthem's counsel wrote to Byrns requesting information about Putnam's billing practices. T4B/849-50. Byrns was asked to describe Putnam's role in providing laboratory services. App.2764. In a letter dated March

---

[8] According to Anthem's expert, pass-through billing is "a phrase used within the [healthcare] industry" to describe "a claim that is submitted under the identifier of one provider for work that is done by a different provider." T5A/1016.

13, Byrns stated that "Putnam owns their full service hospital-based clinical laboratory and the equipment to perform all tests it bills with very few minor exceptions." T4B/856;App.2773. Anthem's counsel later inquired whether Putnam had a relationship with Cadira Labs. App.2790. Byrns responded that "urine and/or blood samples are transported to Putnam's laboratory in accordance with applicable laws and regulations." App.2791.

On March 15, Anthem sent new rate sheets informing Putnam that it would be reducing the rates it paid for outpatient laboratory services. T4B/915, 930-31;App.2565. After the revised rates were instituted, Putnam's claims for lab services declined significantly. T4B/918.

Byrns stepped down as Putnam's CEO in the summer of 2017. T1B/93. In October 2017 the board asked Pickens to take over as CEO. T1B/80. Putnam ended its relationship with SeroDynamics a few months later. T3B/574. Putnam had paid SeroDynamics $6,104,500 and LabMed $20,201,295.40 as their share of payments the hospital had received from insurance companies for lab work performed by SeroDynamics. T2A/141,144.

Plaintiffs filed suit on March 30, 2018. App.1; R. Doc. 1. The parties engaged in three years of discovery and other pre-trial proceedings and preparation. As scanning the District Court's electronic docket makes clear, the litigation became contentious early in the discovery process and remained so

19

throughout trial and beyond. After the defense had rested on the fifth day of trial, the District Court announced that Minana would be prohibited from delivering the defendants' closing argument. T5B/1128-29.

The District Court cited discovery disputes,[9] instances in which it had found Minana's cross-examination objectionable, its view that Minana had misused the word "impeachment,"[10] and undefined "gamesmanship," and expressed its desire to avoid having "to pay extra attention to the defense … during closing argument." T5A/1071-72. Counsel for Anthem endorsed Mr. Minana's exclusion from closing argument:

> Because you know we're going to hear inferences that are both trying to … wrap themselves in David Byrns and … Jorge Perez when it's helpful. Saving the hospital, all that. Oh David Byrns saving. And then they want to tell you … David Byrns, who is that? We had nothing to do with him.

T5A/1076-77. And: "I'm very much concerned … about Mr. Minana's behavior before Your Honor and, frankly, under Your Honor's supervision." T5A/1077.

---

[9] The District Court noted that it had issued approximately 10 *pre-trial* orders addressing discovery compliance: "Some of those, I looked through them before I started this trial, were directed at you and your conduct." T7/1291.

[10] The District Court explained: "What you called impeachment was, in my mind, and I think in Mr. Gleason's mind, … nothing more than cross-examination." T4A/712. And: "I think that you abused this word and that you used this to benefit your clients and also maybe perhaps to get inadmissible evidence in at a time it wasn't admissible … [I]t may be admissible later in the trial but we're talking about that point in time with that particular witness." T4A/712-13.

Appellate Case: 22-3457    Page: 30    Date Filed: 06/12/2023 Entry ID: 5285817

In the end the District Court noted its concern that it "would be unable to protect the jury … from [Minana's] closing argument if it strays." T5B/1123. Minana objected to the ruling, suggesting that it would deny his clients "their choice of counsel" and be "incredibly prejudicial and unfair." T5B/1126. He tried to assure the Court that he could conduct himself appropriately and contended that the record did not support the Court's suggestion of persistent misconduct. T5A/1071-72, 1077-79; T5B/1125-28. And he pointed out the inexperience of his trial assistants, one of whom would have to present the defendants' summation in his absence: "[T]hey are young lawyers who have no experience with this sort of situation." T5B/1125.

The District Court affirmed its removal of Minana. T5B/1129. One of the young lawyers who had assisted Minana presented closing argument for the defendants. T6/1222. The jury returned verdicts finding Gertz, Blake, SeroDynamics, and LabMed Services liable to the plaintiffs for fraud, tortious interference with contract, civil conspiracy, and money had and received, and assessing compensatory damages in the amount of $18,053,015.00. App.1472; R. Doc. 751. The jury subsequently found all defendants liable for punitive damages in the amount of $1,900,000.00. App.1584; R. Doc. 769. Defendants have appealed from the judgment entered on those verdicts. App.1936; R. Doc. 830.

Appellate Case: 22-3457    Page: 31    Date Filed: 06/12/2023 Entry ID: 5285817

## SUMMARY OF ARGUMENT

**1. The District Court abused its discretion in disqualifying the appellants' lead counsel from delivering their closing argument.** The Supreme Court has recognized the singular importance of summation in a jury trial "finally to marshall the evidence … before submission of the case to judgment." *Herring v. New York,* 422 U.S. 853, 862 (1975). That is most true when in a case such as this one: several years of intense trial preparation, days of contentious trial, massive evidence of disputed meaning, challenging theories of liability and defense. This Court has recognized that a district court should remove a party's attorney only when absolutely necessary. *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006). The District Court had other, better options in this case.

**2. The District Court erred in admitting portions of the Missouri Auditor's report.** Over objection, the district court allowed the plaintiffs to introduce evidence of a state auditor's report suggesting improper billing practices in connection with laboratory contracts at Putnam County Memorial Hospital. The plaintiffs had persuaded the court that the report was relevant to prove its effect on Pickens, the hospital's CEO. After being allowed to show excerpts from the report to the jury, the plaintiffs never questioned Pickens about that effect. The plaintiffs'

22

purpose was to exploit the prejudice inherent in the report. The district court's ruling enabled that exploitation.

**3. The District Court erred in submitting fraud claims to the jury.** One element of the plaintiffs' fraud claims was each defendant's making of a false representation. The plaintiffs' representation alleged in this case was the submission of claims for laboratory testing that falsely suggested the patients were connected to Putnam County Memorial Hospital. The evidence established without controversy that none of the defendants submitted any claims or made any false representations to Anthem.

**4. The District Court erred in submitting tortious interference with contract claims to the jury.** Two elements of the plaintiffs' tortious interference claims were each defendant's knowledge of the contract—in particular in this case, actual or constructive knowledge that the Anthem-Putnam contract forbade reference lab agreement and billing arrangements between Putnam and Defendants—and the absence of justification for the defendant's conduct. The plaintiffs failed to prove either of those elements.

**5. The District Court committed plain error in giving the plaintiffs' second alternative fraud instruction.** The challenged verdict directing instruction—one of three submissions of fraud given by the District Court at the

23

plaintiffs' request—did not hypothesize the facts essential to the plaintiffs' fraud claims and omitted elements essential to liability for fraud.

**6. The judgments for civil conspiracy cannot survive reversal of the judgments on the predicate claims of fraud and tortious interference with contract.** Missouri law precludes the recovery of damages for civil conspiracy when the underlying tort claim has failed. *Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 700 (8th Cir. 2002).

**7. The District Court committed plain error in entering judgment against Defendants for money had and received because the evidence was incapable of proving damages in the amount awarded.** Recovery for money had and received is limited to the amount received by the defendant. *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 898 (8th Cir. 2014). The jury awarded Anthem the precise amount that the plaintiffs had paid to Putnam for all blood tests performed by SeroDynamics. There was zero evidence of the amount paid by Putnam to Defendants. Fortune, the plaintiffs' damage expert, agreed that Putnam did not transfer all that it received to those defendants. Recovery under this theory requires "[p]roof of actual facts which present a basis for a rational estimate of damages without resorting to speculation." *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. Ct. App. 2001).

24

**8. The punitive damage awards cannot survive reversal of judgments on the predicate claims of fraud, tortious interference, and civil conspiracy.**

Failure of a plaintiff's predicate tort claims mandates the reversal of an associated punitive damage award. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 526 (Mo. Ct. App. 2007).

Appellate Case: 22-3457     Page: 35     Date Filed: 06/12/2023 Entry ID: 5285817

## ARGUMENT

**I.**    **The District Court abused its discretion in disqualifying the appellants' lead counsel from delivering their closing argument.**

### Standard of Review

This Court reviews a District Court's imposition of sanctions under its inherent power for an abuse of discretion. *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 267 (8th Cir. 1993). "An abuse of discretion occurs where the district court fails to consider an important factor, gives significant weight to an irrelevant or improper factor, or commits a clear error of judgment in weighing those factors." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). "[T]he extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006).

### Argument

The Supreme Court summarized the importance of summation by counsel when the presentation of evidence has been concluded in a criminal trial:

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions.

26

*Herring v. New York*, 422 U.S. 853, 862 (1975). The Court went on to recognize that no aspect of the partisan advocacy at the heart of our adversary system of justice "could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Id.*[11]

Mr. Blake and Mr. Gertz were on trial for their economic lives in this civil case. The Supreme Court's observations about the centrality of summation to the factfinding process in an adversarial system of justice applies here with equal force and logic. With due respect for a district court's discretion—its obligation—to maintain order in its proceedings, *id.,* the removal of Mr. Minana was ill-considered, inevitably impactful, and cannot be squared with the idea of a fair trial. This Court should reverse the judgment that ensued.

Mr. Minana had served as the appellants' lead attorney through three years of discovery and preparation and the entirety of trial.[12] The record on appeal

---

[11] Or, from the perspective of a District Judge:

> Everything you have done in preparation of your case is directed to this one moment—final argument. Every witness you have ever interviewed, every witness you have prepared, every measurement you have taken, every expert you have examined, every treatise you have read and briefed, is directed to this dramatic moment.

Hon. G. Ross Anderson, Jr., *A Judge's Suggestions for Closing Argument: All of Your Hard Work Leads Up to the Most Important Part of Any Trial: The Closing Argument*, 13 No. 6 Prac. Litigator 47 (American Law Institute 2002)

[12] Mr. Minana had been assisted at trial by two younger attorneys from his firm. As he informed the District Court: "While Aaron Chickos and J.R. Montgomery are

reflects aggressive lawyering by the principal attorneys for both sides throughout. *See, e.g.,* App. 1689-1715; R. Doc. 798, at 1-27. In summation counsel would be called upon to guide jurors through massive evidence, much of it technical or legal and subject to interpretation, and voluminous testimony, some given by expert witnesses, much by both expert and lay witnesses offering divergent explanations and interpretations of the recorded and oral history of sometimes but not always relevant transactions. That "opportunity finally to marshal the evidence" before the jury began its deliberations was critical in this case.

The District Court explained its decision to prohibit the defendants from relying on their lead counsel at that point: "[M]y concern is, it just seems like I've got to pay extra attention to the defense on this case because of gamesmanship, and I don't want to do that during closing argument." T5A/1072. And: "… I don't think that I have the ability to be involved in your closing argument for an hour and a half or however long it is to make sure that this jury is not receiving mischaracterized, misinferenced information." T5B/1128.[13]

_____

terrific lawyers, they are young lawyers who have no experience with this sort of situation." T5B/1125. Mr. Minana told the Court that this had been Mr. Chickos "first jury trial ever" and that Mr. Montgomery had "never given a closing argument in a jury trial before." T6/1150-51. The Court ultimately disagreed: "I'm going to order that … Mr. Chickos or Mr. Montgomery are well-suited to [give closing argument] and looks like very qualified to do that." T5B/1124.

[13] Anthem welcomed the District Court's decision to remove Mr. Minana. Asked by the Court whether he had "any concerns … about this decision that I'm embarking on here today," counsel for Anthem endorsed the elimination of his

28

Given the mass and density of the evidence in this case, and the attendant importance to each party of that "opportunity finally to marshal the evidence," the District Court should at least have tried to fulfill its traditional role of presiding over closing argument and reserving its rulings on objectionable conduct—and any intervention *sua sponte* that might be required—until the conduct materialized. The alternative of anticipating objectionable conduct and preempting the defendants' interest in representation by their chosen counsel in summation should not be endorsed on appeal.

This Court has recognized that "[a] party's right to select its own counsel is an important public right and a vital freedom that should be preserved," and that "the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." *Macheca Transport Co.*, 463 F.3d at 833; *see also F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995) (characterizing the choice of counsel for civil litigation as an "important societal right"); *Melamed v. ITT Cont'l Baking Co.*, 592 F.2d 290, 293 (6th Cir. 1979) (characterizing civil litigants' freedom to choose their own attorney as "an important public right"); *cf. Koller v. Richardson-Merrell, Inc.,* 737 F.2d 1038, 1056 (D.C. Cir. 1984) (stating that "[e]xcept in cases of truly egregious misconduct

adversary from closing argument: "I believe it is well within the Court's discretion and so we have no concerns." T5B/1124-25.

Appellate Case: 22-3457     Page: 39     Date Filed: 06/12/2023 Entry ID: 5285817

likely to infect future proceedings, other means less prejudicial to the client's interest than disqualifying the counsel of her choice are ordinarily available"); *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 564–65 (2d Cir. 1973) (noting the courts' responsibility to balance "the need to maintain the highest ethical standards of professional responsibility" against "an individual's right to his own freely chosen counsel"). In truncating that right here, the District Court failed to give adequate consideration to less drastic alternatives, gave excessive weight to specific instances of Mr. Minana's conduct that the Court found objectionable, and erred in its weighing of factors pertinent to its ruling.

District courts have inherent authority to control the behavior of litigants and counsel and discretion with respect to the imposition of sanctions in the service of that authority. *Dillon,* 986 F.2d at 26. But this Court has made it clear that a district court must not exercise the power to remove a party's chosen attorney unless that sanction is "absolutely necessary." *Macheca Transport Co.*, 463 F.3d at 833. The focus of review when the removal of counsel is challenged must be on whether the removal of counsel was absolutely necessary in the premises faced by the District Court. The standard of review must not include a requirement that the appellants challenging the removal of their attorney prove that the removal of their attorney resulted in specific prejudice—that is, altered the outcome of trial.

Appellate Case: 22-3457     Page: 40     Date Filed: 06/12/2023 Entry ID: 5285817

Other circuits have recognized that "[i]t would be … 'an almost insurmountable burden' for the losing party 'to show that he lost the case because he was improperly forced to change counsel.'" *Koller,* 737 F.2d at 1050 (quoting *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1026–27 (5th Cir. 1981)).[14] The precise effect of the present disqualification order on the outcome of trial cannot be demonstrated: would Mudville still have lost if it was not Casey but a pinch-hitter at the bat? Unless a District Court's authority to remove a litigant's attorney during trial is unreviewable, this Court should define the appellants' burden as showing that (1) the sanction was not "absolutely necessary" and (2) viewed objectively in terms of the particular case, the removal of one party's attorney diminished the party's capacity to succeed in the litigation. In this case, that standard would require reversal.

(1) *Removing Mr. Manana was not "absolutely necessary."* With  respect for the District Court's requirement of orderly proceedings, recognition that Mr. Minana's advocacy before and during trial had been aggressive and sometimes objectionable, and regard for the diminution of judicial tolerance effected by that

---

[14] In both *Koller* and *Duncan* the observation was made in the course of determining that trial court orders disqualifying counsel must be reviewable by interlocutory appeal. *Koller,* 737 F.2d at 1050; *Duncan,* 646 F.2d at 1026-27. This case is fundamentally different: the District Court's removal order was made in trial, on the eve of closing argument. Appeal at that time was an impossibility. Post-judgment appeal constitutes the sole possibility of relief in that circumstance.

Appellate Case: 22-3457     Page: 41     Date Filed: 06/12/2023 Entry ID: 5285817

conduct, the District Court's explanation of its decision to prohibit the defendants' lead attorney from making their closing argument does not demonstrate the absolute necessity of that sanction:

• The Court recalled repeated failures to comply with discovery requirements during the several years prior to trial, allowing that "[n]ot all these are directed at Sero, but a lot of them are." T4A/710. The Court offered no specific logical connection between those discovery violations and some likelihood of egregious misconduct in closing argument.

• The Court recalled that the defendants had caused a delay in the identification of facts for stipulation by failing to deliver "any edits to plaintiffs' proposed stipulations" until late in the evening that the stipulation was to be filed. T4A/710. It acknowledged the defendants' contention that they had conferred with the plaintiffs in good faith, noting: "But really, that was kind of common to what we saw as far as the conduct of the Sero defendants in this case." T4A/710.

• The Court recalled Mr. Gertz's response when Mr. Minana asked if he had been questioned by law enforcement: "His answer was, No. *Which I think is a correct answer."* T4A/711 (emphasis added). The Court then noted that Mr. Gertz's and Mr. Blake's attorneys had met with federal prosecutors, who ultimately chose not to charge Mr. Gertz or Mr. Blake. T4A/711-12. The Court concluded: "I know that law enforcement didn't talk to Gertz or Blake probably,

32

but they talked to their attorneys. I think this is an unfair representation that you made to the jury in that response." T4A/712.

  • The District Court suggested that Mr. Minana "abused" the term "impeachment" during his cross-examination of Anthem employee Carey Bobbitt and "used this to benefit your clients and also maybe perhaps to get inadmissible evidence in at a time it wasn't admissible." T4A/712-13. Mr. Minana had shown Ms. Bobbitt an informational bulletin obtained from a state healthcare website and sought to question her about a proposition in the document. T3B/678-80. The witness denied knowledge of the document, counsel for Anthem objected to Mr. Minana offer and to a follow-up question, and the District Court sustained both objections. T3B/678-79. Mr. Minana explained that he had been surprised by the witness' testimony about claims processing during direct examination:

> I was very surprised by the formula because she didn't testify about any of that when I took her [deposition] … She says that hospitals cannot do this. The State of Missouri specifically authorizes that. That … goes to impeach her testimony.

T3B/680-81. The District Court responded at the time: "[S]he's testifying about what Blue Cross Blue Shield does. That's all she's testifying to. She's not testified about the law yet. That's all she's testified to." T3B/681. Explaining its inclination to remove Mr. Minana prior to closing argument, the Court characterized his attempt to impeach Ms. Bobbitt with the state informational document as "trial by

ambush"—allowing at the same time that the evidence could be admissible later in the trial. T4A/713.

(2) *Under an objective standard that posits the importance of closing argument to the meaningful presentation of a party's case, the District Court's exclusion of Mr. Minana from closing argument in this trial resulted in prejudice to the defendants.* There may be cases in which "the opportunity finally to marshal the evidence … before submission of the case to judgment" is less than critically important. This was not one of them. Nor is it reasonable to conclude that Mr. Minana's clients had any prospect for equivalent closing argument by another attorney.

The Anthem and Blue Cross Blue Shield insurance companies on the one side, and Mr. Blake and Mr. Gertz on the other, spent three years processing massive documentary discovery, preparing for and taking depositions, conducting investigations, preparing for the presentation of their own evidence and for the cross-examination of Anthem lay and expert witnesses, and then a week wrangling their way through the presentation of that evidence, from which the jurors would be called upon to resolve the remarkably complex factual and legal disputes that the parties had constructed. Informed and thoughtful verdicts in this case depended upon closing argument for both sides by attorneys steeped in that evidence, experienced and skilled in the jury trial process, and thus capable of "arguing the

34

inferences to be drawn from all the testimony" and clearly "point[ing] out the weaknesses of their adversaries' positions." *Herring*, 422 U.S. at 862.

Mr. Minana was who the defendants selected for that job. Mr. Minana suggested to the District Court that neither of the young attorneys who had occupied the second and third chairs at the defendants' counsel table ever had presented closing argument to a jury. One was sitting in on his first jury trial. More importantly, neither had spent the preceding three years anticipating that he would be delivering the defendants' summation of the vast body of testimonial and documentary evidence and figuring out how he would marshal that evidence into an effective closing argument.[15] The likelihood that the removal of a party's counsel of choice would produce this adversarial handicap surely was this Court's reason for cautioning district courts that this "extreme measure" is an option only "when absolutely necessary." *Macheca Transport Co.*, 463 F.3d at 833.

The District Court did nothing to interfere with Anthem's capacity to provide the jury with the guidance of closing argument contemplated by the

---

[15] As Magistrate Judge Robert Larson has explained, the groundwork for delivering an effective closing argument begins well before the end of trial:

> Prepare the closing argument before arriving in court to try the case. As the trial progresses, review, modify, and edit the argument to conform to evidence actually presented at trial, drawing the logical inferences from that evidence.

Robert E. Larsen, *Navigating the Federal Trial* § 12:55 (2022 ed.).

Appellate Case: 22-3457     Page: 45     Date Filed: 06/12/2023 Entry ID: 5285817

Supreme Court in *Herring*. The Court's removal of Mr. Minana kneecapped the defendants. Neither the record in general nor the District Court's explanation of its ruling in particular can establish that the disqualification of the defendant's lead counsel was "absolutely necessary," or necessary at all. Other remedies or sanctions were available to the Court if its anticipation of misconduct in closing argument materialized—beginning with the traditional practice of requiring opposing counsel to object to perceived improprieties and ruling on those objections or requests for other remediation and extending to the panoply of sanctions authorized or prescribed by rules such as Fed. R. Civ. P. 11 and statutes such as 28 U.S.C. § 1927.

This Court's review of that ruling will provide guidance if the inclination to impose a like sanction ever arises for a district judge in the future. Affirmance in this case would set a low bar for such a drastic measure. Reversal and a new trial are necessary for a fair and proper resolution of claims and defenses in this case and to make it clear that the sanction of removing a civil litigant's attorney of choice actually is appropriate only when "absolutely necessary."

## II. The District Court erred in admitting portions of the Missouri Auditor's report.

### Standard of Review

This Court reviews a district court's evidentiary rulings under an abuse of discretion standard. *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 956 (8th Cir. 2021). Reversal is appropriate "when an improper evidentiary ruling affected the defendant's substantial rights. *Id*.

### Background

In August 2017 the Missouri Auditor released a report regarding its audit of Putnam. Defendants moved in limine to exclude the report. They argued that the report was unfairly prejudicial because it contained inflammatory language including that fraud occurred at the hospital and that there were "questionable billing practices." App.1120; R. Doc. 638, at 17. They also maintained that admitting the report "would allow backdoor expert opinion on an ultimate issue for the jury to decide, such as whether the Sero Defendants' conduct was fraudulent, illegal, or violated Plaintiffs' contracts with Putnam." App.1120-21; R. Doc. 638, at 17-18.

Though the court declined to rule on the motion before trial, it stated it would not "allow portions of the report to be introduced that make or insinuate the legal conclusion that fraud was committed." App.1394; R. Doc. 708, at 13. It explained that the report may be "admissible not for the truth of the matter asserted

37

in it, but for the purpose of the effect on those witnesses that read it." App.1395; R. Doc. 708, at 14. The court deferred ruling until it was clear "what portions of the report Plaintiffs seek to admit, and for what specific purpose." *Id*.[16]

As its first witness Anthem called Gayle Pickens. Pickens became Putnam's director of nurses in 2013 and has served as CEO since October 2017. T1B/80-81. Pickens testified that Putnam is overseen by a Board of Trustees whose duties include establishing the policies and procedures of the hospital and ensuring its regulatory compliance. T1B/87. She attended board meetings in 2016 and 2017. T2A/159. Pickens testified that when Byrns was in charge of Putnam he was the only person who had "any say or control over the finances of the hospital." T2A/144. According to Pickens, Byrns was not "forthcoming…on the details" about Putnam's use of out-of-state laboratories. T1B/98. She claimed that the Board was unaware of the contract between Putnam and Empower. T1B/96-97.

In cross-examining Pickens, defense counsel sought to establish that Byrns informed the Board of the sources of the hospital's revenues and expenses. Pickens agreed that every month Byrns answered the Board's questions and submitted the

---

[16] The court later explained its basis for refusing to admit the report for its truth was Defendants' inability to cross-examine the report. T1B/37. This was an appropriate consideration in deciding whether to admit the auditor's report. *Johnson v. Yellow Freight Sys., Inc*., 734 F.2d 1304, 1309 (8th Cir. 1984) (stating that the court may consider the opposing party's inability "to cross-examine the report").

Appellate Case: 22-3457     Page: 48     Date Filed: 06/12/2023 Entry ID: 5285817

check register and financial report which showed "every check and every wire transfer," including payments to SeroDynamics, LabMed, and Empower. T2A/203-07;App.2607. She acknowledged that the Board approved the check register and financial report by formal motion each month. T2A/203-07. In response to the court's question as to whether Byrns "hid information" from the Board, Pickens answered:

> I think there may have been [sic] misunderstanding of the board to the details of all of it. They're not medical people, Your Honor. And we had – we were doing urine samples in the hospital at that time. They wouldn't have distinguished between blood or urine samples, because they were – they were handed a financial statement, which was, I'm assuming, included everything, obviously, that came through the bank. They wouldn't have known the difference between what the urine we were doing in-house versus the blood that was being collected out into the field.

T2A/206.

During Pickens' redirect examination, the court notified counsel of its belief that some portion of the auditor's report was admissible based on defense counsel's questions about the Board's oversight. T2A/220-21. The court explained that Pickens "was told not to talk about this report" and "some of those questions [on cross-examination]…were closely related to things contained in this report and…might add a completeness to her testimony and, in fairness, that [Plaintiffs] should be able to refer to this in a limited way." T2B/240. The court stated that the evidence would not be admitted for its truth but to show its "effect and impacts on"

39

Pickens. T2B/239-45; T3B/550. Plaintiffs' counsel agreed to that limitation. T2B/246-48.[17]

Defense counsel argued that the report remained inadmissible for the same reasons previously asserted. T2A/221. He explained his cross-examination targeted Pickens' testimony that Byrns "didn't tell us anything" and sought to establish that Byrns "did tell the board what was going on." T2A/230. He reiterated the objections that the report was unfairly prejudicial and that introducing the report would be tantamount to admitting an expert opinion of an auditor. T2A/221,230,232. Defense counsel further objected that the report was irrelevant because it does not mention Defendants and no claim has been asserted against Putnam. T1A/37; T2A/223. The court overruled those objections. T2A/229; T2B/244. It acknowledged that admission of a government report is "always a difficult decision" and cautioned Plaintiffs' attorney "to be very careful about what is offered" because he "may have to defend [the decision] one day." T2A/224,231.

The court allowed Plaintiffs to introduce three sentences it selected from the auditor's report. When counsel moved to admit the evidence for "a limited purpose," T2B/248, the court instructed the jury:

---

[17] Before opening statements, Anthem's attorney said he wanted to ask Pickens about the auditor report "not to prove the truth of the matter asserted" but "to show why [she] took certain steps after." T1B/33; *see also* T1A/7-8. Defense counsel replied that Pickens could offer such testimony "without showing the jury this report." T1A/8.

Appellate Case: 22-3457     Page: 50     Date Filed: 06/12/2023 Entry ID: 5285817

You are about to hear evidence of an audit conducted by the…Missouri State Auditor of…Putnam the Putnam County Memorial Hospital, or Putnam, including some excerpts from the Auditor's report. You may not consider this evidence for the truth of the matter asserted in the report. For example, you may not consider anything in the report as evidence that Putnam was engaged in questionable laboratory billing practices with anyone.

You may consider this evidence for the following purposes only: Number 1, in explaining the audit's effects or impact on a listener, such as explaining why a witness undertook a certain action after learning…of the audit. Number 2, to show the mental state of a party or witness, for example, to show that person's intent. Number 3, to show proof of notice to one who learned of the audit. Number 4, to show the knowledge of one who learned of the audit. Number 5, to judge a witness' credibility about whether he or she believed something to be true because of the audit.

T2B/249;App.1529; R. Doc. 760, 12.

Plaintiffs' counsel proceeded to show the jury this excerpt from the report:



Appellate Case: 22-3457    Page: 51    Date Filed: 06/12/2023 Entry ID: 5285817

App.1413, 2000; R. Doc. 723-1, at 2.

Plaintiffs' attorney read all three sentences aloud and asked Pickens for her "understanding about what the Board knew or didn't know about the activities of Hospital Partners, Mr. Perez, and Mr. Byrnes with regard to out-of-state lab activity." T2B/250-51. Pickens responded:

> They didn't know a lot of detail. They knew that we were doing urine samples, like I had stated earlier. The management company took care of the business side. Their job was more policies, procedures, and oversight in that regard. They didn't know great details.

T2B/251.[18] Plaintiffs' counsel then ended his examination without asking Pickens whether she took any actions after seeing the excerpted material. T2B/251.

## Argument

While government reports are not excludable as hearsay under Fed. R. Evid. 803(8), they should not be admitted if "sufficient negative factors" exist. *Johnson*, 734 F.2d at 1309 (a government report's "probative value may be outweighed by problems that would result from [its] admission"). Government reports are inadmissible if they are irrelevant or unfairly prejudicial. *Id.*; *see also Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343–45 (3d Cir. 2002) ("Rule 403 is an 'umbrella rule' spanning the whole of the Federal Rules of Evidence."). Government reports should be excluded as unfairly prejudicial when they "amount

---

[18] Pickens' answer tracked her previously cited testimony concerning whether she thought Byrns withheld information from the Board. *See supra* (quoting T2A/206).

42

to admitting the opinion of an expert witness as to what conclusions the jury should draw." *Johnson*, 734 F.2d at 1309; *see also Dindinger v. Allsteel, Inc.*, 853 F.3d 414, 427–28 (8th Cir. 2017). Another consideration in deciding whether to exclude evidence is the "availability of other means of proof." Fed. R. Evid. 403, advisory committee's notes.

A.    The evidence was not relevant

The district court admitted the excerpt from the auditor's report for the purpose of showing its effect on Pickens. Plaintiffs' counsel, however, negated that limited basis for admission by failing to ask Pickens how the report affected her. The sole question Anthem's counsel posed to Pickens after the evidence was admitted pertained to her "understanding" of the Board's knowledge of the out-of-state lab activity. T2B/250-51. Because the evidence was not used for a permissible purpose, it had no probative value.

Even if Anthem had asked Pickens what she had done after she learned of the auditor's conclusion regarding the adequacy of the board's oversight, her answer would not have tended to prove or disprove any fact of consequence to the action. Fed. R. Evid. 401. It would not have been probative of whether Defendants (or anyone else) acted improperly in connection with the billing of the at-issue claims. *See United States v. Reyes*, 18 F.3d 65, 71 (2d Cir. 1994) (explaining that the customs agent's state of mind "may be relevant to the history of the

43

investigation, but the history of the investigation was not relevant to the guilt or innocence of the defendant").

> B. The evidence should have been excluded under Rule 403

Even if the evidence could have had some marginal relevance in explaining Pickens' course of action, it should have been excluded because its marginal probative value was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.[19] "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Firemen's Fund Ins. Co. v. Thien*, 63 F.3d 754, 758 (8th Cir. 1995).

The probative value of a government report depends on "the proof value of the…report as and when offered at trial." *Coleman*, 306 F.3d at 1345. The potential relevance of the excerpts from the auditor's report was eroded by Pickens' testimony during direct examination about her response to the audit.[20] Pickens testified that she launched an investigation into the hospital's finances after the audit was released and "the facts came out" about "the amount of cash that had been transferred…through our account." T2A/137-38. After the audit "hit the

---

[19] "Rule 403 explicitly requires consideration of probative value, though not for forbidden purposes." Wright & Mueller, 21A Fed. Prac. & Proc. Evid. § 5063.1 n.34 (2d ed. 2023).

[20] The court didn't preclude Pickens from referring to the audit during direct examination to explain the effect it had on her. T2A/149-50 ("[S]he can reference why she did what she did…. I just said the audit [report] wasn't coming in. There wasn't an instruction that she couldn't talk about the audit.").

Appellate Case: 22-3457      Page: 54      Date Filed: 06/12/2023 Entry ID: 5285817

streets," Pickens recalled that hospital personnel "were afraid," several board members quit, and patients "questioned our billing." T2A/148,154. Pickens described the audit as "devastating for our board members." T2A/154.

The availability of this testimony from Pickens further diminished the probative value of the auditor's report. *See Dindinger*, 853 F.3d at 428 (stating that the availability of other means of proof is a proper consideration in deciding whether to exclude evidence) (citing Fed. R. Evid. 403 advisory committee's note). Pickens explained that she launched the investigation into the hospital's finances after learning of the criticism leveled at the hospital by the state auditor. T2A/137-38,148,154. If Anthem's counsel believed a more detailed explanation would have been relevant, he could have further inquired without admitting the report. Allowing Anthem to highlight the auditor's conclusions regarding the impropriety of billing out-of-state lab work through the hospital was unduly prejudicial due to its likelihood of inflaming the jury.

The report's limited probative value was substantially overshadowed by its inevitable prejudice to Defendants' substantial rights. The admission of the report at the beginning of the trial shaped the juror's initial impressions of the defendants and likely influenced the verdict. Anthem's claims depended upon the jury reaching the same conclusions as the auditor—that "the CEO and *his associates*… bill[ed] significant amounts of out-of-state lab activity through the hospital" and

45

that these actions constituted "questionable *laboratory* billing practices." App.2001 (emphasis added).

The report allowed Anthem to tie Defendants to the very conduct the auditor lambasted. Anthem had cast Blake and Gertz as associates and *co-conspirators with* Byrns in a conspiracy to defraud the insurance company. During its opening statement a few hours before jurors would see the report, Anthem told the jury that Blake and Gertz "teamed up" with Byrns "to submit bills to insurance companies for laboratory tests." T1B/44. Of the alleged co-conspirators, only Blake and Gertz operated a company that could have engaged in questionable *laboratory* billing practices. By intimating that Defendants billed for lab work through Putnam, the report undermined their key defense to the fraud claim—that they had not submitted bills or made false representations to Anthem.

The auditor's conclusion that the hospital was involved in questionable billing practices was also prejudicial. It suggested billing out-of-state lab activity through the hospital would breach Putnam's contract with Anthem, which is an essential element of Plaintiffs' claim for tortious interference with a contract.

The prejudicial effect of the evidence was magnified because the auditor's conclusions were tantamount to an expert opinion on ultimate issues. *Johnson*, 734 F.2d at 1309. This Court has recognized that even when a government report is not particularly probative, there is a danger the report will "sway" the jury by its "aura

46

of special reliability and trustworthiness." *Gehl by Reed v. Soo Line R. Co.*, 967

F.2d 1204, 1208 (8th Cir. 1992) (quoting *City of New York v. Pullman Inc.*, 662

F.2d 910, 915 (2d Cir. 1981)). The primary concern with admitting a government

report is its potential for unfair prejudice "because it suggests to the jury that an

official fact-finding body had already decided" an issue and "the jury would rely

on the [agency's] results instead of its own judgment in determining whether the

plaintiffs had proven their claims. *Dindinger*, 853 F.3d at 427 The danger that the

jury would defer to the auditor's conclusions applies with equal force in this case.

C.     The limiting instruction was not effective

The court's instruction that the jurors could not consider the auditor's report

for its truth did not mitigate the unfair prejudice of the evidence. "[A] limiting

instruction is not a cure for any and all Rule 403 errors." *Krekelberg*, 991 F.3d at

957. While courts usually assume that juries will follow limiting instructions, there

are "occasions where the prejudice is so severe that such instructions are unlikely

to be effective." *Reyes*, 18 F.3d at 71-72. "[T]he mere identification of a relevant

non-hearsay use of such evidence is insufficient to justify its admission if the jury

is likely to consider the statement for the truth of what was stated with significant

resultant prejudice." *Id.* at 70. "Regardless of the reason for which the court and

the [proponent] thought the evidence was being offered, the prejudice inquiry asks

whether the jury was likely to consider the statement for the truth of what was

47

stated with significant resultant prejudice." *United States v. Adams*, 722 F.3d 788, 831 (6th Cir. 2013) (quoting *United States v. Evans*, 216 F.3d 80, 87 (D.C. Cir. 2000)) (cleaned up).

Before admitting a portion of the auditor's report, the district court expressed doubt over the effectiveness of a limiting instruction:

> [S]o my record's clear, the reason I'm doing this is probably the argument you're making, there's no way to cross-examine this report. It's just laying there, and even though I gave a limiting instruction, I worry about that limiting – I've put reports like this in before and gave limiting instructions, but I do worry about the effect of a limiting instruction.

T1B/37.

The court erred in not heeding its own concern about the jury's ability to obey the limiting instruction. Jurors would reasonably consider the Missouri Auditor a reputable source and give inordinate weight to her conclusions. Plaintiffs' failure to asked Pickens how she was affected by the report after insisting on the report be admitted for that purpose demonstrates that Anthem sought to influence jurors with the report's inflammatory conclusion that Byrns and his associates improperly billed out-of-state laboratory services through the hospital. *See* Wright & Mueller, 21A Fed. Prac. & Proc. Evid. § 5063.1 (2d ed.) (explaining that the offeror's improper motive can justify exclusion of evidence if "the court can infer that the offeror really wants the evidence before the jury for its forbidden purpose rather than for the ostensible but permissible purpose."). The

48

limiting instruction is not effective at deterring jurors from considering evidence for its truth when the evidence was significant and intended for no other purpose. *See Reyes*, 18 F.3d at 71-72.

Admission of the report was an abuse of discretion because the evidence was not presented to jurors for any relevant purpose and the sole remaining use and effect of the evidence was exceptionally prejudicial to the defendants on issues essential to the plaintiffs' claims. *See Adams v. Fuqua Indus., Inc.*, 820 F.2d 271, 273 (8th Cir. 1987) (holding that "[w]here the district court excludes evidence of a critical nature, so that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted, the trial court has abused its discretion").

This Court should reverse the judgment and remand the case for a new trial.

Appellate Case: 22-3457    Page: 59    Date Filed: 06/12/2023 Entry ID: 5285817

### III. The District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the fraud claims and in submitting those claims to the jury.

#### Standard of Review

This Court reviews the denial of a motion for judgment as a matter of law de novo, considering the evidence in the light most favorable to the verdict. *Borchardt v. State Farm Fire & Cas. Co.*, 931 F.3d 781, 784 (8th Cir. 2019).

#### Argument

The elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity, or his ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) his right to rely thereon; and (9) the hearer's consequent and proximately caused injury. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988). The failure to establish any of these is fatal to recovery. *Id.*[21]

---

[21] A fraud claim can also be predicated on nondisclosure or concealment. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 768 (Mo. 2007). When such a claim is submitted, the defendant's "silence in the face of a legal duty to speak replaces the first element: the existence of a representation." *Id.* The court permitted Anthem to submit claims for fraudulent concealment as its first alternative fraud instruction. App.1549-52; R. Doc. 760, at 32-35 (Instructions 27-30). The jury returned verdicts for Defendants on those claims. App.1473; R. Doc. 751, at 2. Anthem's second alternative fraud claim, which it characterized as "acceptance of proceeds of fraud" (T6/1220), fails as a matter of law for the same

Anthem's fraud claims fail as a matter of law because there is no evidence Defendants made any false representation in connection with the submission of Putnam's claims for blood testing. The actionable misrepresentation under Anthem's fraud theory is the submission of claims for blood testing in a manner that made it appear as though the patients had a connection to Putnam when, in fact, they did not. Putnam or Empower (its billing agent) may be liable for fraud on this basis. But the fraud claims are not viable against Defendants because they did not submit any claims or make any false representations to Anthem.

Defendants sent patient and testing data to Empower. T3A/504; T5A/992. The information Defendants furnished was complete and accurate. The parties stipulated that "[t]he blood tests performed by SeroDynamics were ordered by real physicians for real patients and were actually performed." App.1536; R. Doc. 760, at 19; *see also* T4A/752. Empower took the information submitted by SeroDynamics and added Putnam's TIN and NPI to the UB-04 for every at-issue claim. T3A/447-48,472,504; T3B/614; T5A/992. Anthem employees testified that the inclusion of Putnam's provider numbers on the UB-04 led Anthem to believe that Putnam performed the tests in its lab. T3B/625-26,681-82.

---

reason as its primary fraud claim—there was no evidence that Defendants made a false representation. To the extent the second alternative fraud claim purports to be some other species of fraud, it is not a claim recognized by Missouri law and was not submissible. *See Hess*, 220 S.W.3d at 768.

51

While Missouri law allows liability for fraud to be predicated on an indirect misrepresentation, Anthem also failed to make a submissible case against Defendants on that basis. Missouri has adopted the Restatement's rule concerning misrepresentations to third parties:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

*Wagner v. Mortg. Info. Servs., Inc.*, 261 S.W.3d 625, 640 (Mo. Ct. App. 2008) (citing Restatement (Second) of Torts § 533 (1977)). The evidence established no such thing.

Only the "maker of a fraudulent misrepresentation" is subject to liability for indirect misrepresentations. *Id.*; *see Freeman v. Myers*, 774 S.W.2d 892, 893 (Mo. Ct. App. 1989) (holding that vehicle seller's predecessor-in-title was liable for indirect false representation to buyer when he falsified the mileage on the odometer statement). Defendants cannot be liable for making an indirect misrepresentation when they were not the source of a misrepresentation. Again, the patient and test information SeroDynamics sent to Empower and Empower forwarded to Anthem was not false. The alleged falsity (using Putnam's TIN and NPI on the UB-04 forms) was made by Putnam or Empower. Because Defendants

52

did not convey false information to Anthem directly or indirectly, the district court erred in denying their motion for judgment as a matter of law on the fraud claims.

Because Plaintiffs failed to prove all essential elements of their fraud claims, this Court should reverse the judgment in favor of Plaintiffs as to all the fraud claims and remand the case with instructions to order entry of judgment for Defendants on those claims.

Appellate Case: 22-3457    Page: 63    Date Filed: 06/12/2023 Entry ID: 5285817

**IV. The District Court erred in denying Defendants' Motion for Judgment as a Matter of Law on the tortious interference with contract claims and in submitting those claims to the jury.**

### Standard of Review

This Court reviews the denial of a motion for judgment as a matter of law de novo, considering the evidence in the light most favorable to the verdict. *Borchardt v. State Farm Fire & Cas. Co.*, 931 F.3d 781, 784 (8th Cir. 2019).

### Argument

The elements of a claim for tortious interference with contract in Missouri are (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional conduct interfering with or causing a breach of the contract, (4) the absence of justification and, (5) damage resulting from defendant's conduct. *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990). The judgment in this case should be reversed because Anthem failed to prove Blake's or Gertz's knowledge of its contract with Putnam or the absence of justification for their agreement to serve as Putnam's reference lab.

At a minimum, the knowledge element of this tort requires proof "that defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Robb v. Bond Purchase, L.L.C.*, 580 S.W.3d 70, 85 (Mo. Ct. App. 2019).

54

Both Gertz and Blake requested copies of the Anthem-Putnam contract from Putnam. T3A/463,467,499-502. Neither ever received a copy. T3A/463,467,499-502;App.2287; R. Doc. 552, at 32. Blake did discuss the contract with Putnam's attorney, who previously had been the director of a Medicaid fraud agency in Florida and who provided assurance that the proposed reference lab arrangement between Putnam and SeroDynamics was complaint with the contract between hospital and insurer. T3A/499-502.

Burch, the manager in charge of Anthem's contract with Putnam, told the company's senior fraud investigator that the contract had been prepared "on an old contract template" and did "not address pass through billing" at all. T4B/846;App.2751. She also reported that Anthem was in negotiations to replace its current contract with Putnam "to our current contract template that addressed pass through billing," noting that she did not believe "that we can hold them to the pass through rule if it is silent in their current contract." T4B/847;App.2751. The notion that Anthem proved Blake or Gertz knew that the pass-through billing component of their proposed reference lab arrangement with Putnam would cause the hospital to breach its contract with Anthem—or that they would have gained that knowledge by "reasonable inquiry"—is far-fetched indeed.[22]

---

[22] *Mission Toxicology, LLC v. Unitedhealthcare Ins. Co.*, 499 F. Supp. 3d 350 (W.D. Tex. 2020), addressed the knowledge a laboratory defendant must have regarding the health insurance contract with which it allegedly interfered. The

55

Anthem also bore the burden of proving that the defendants were unjustified in entering into their reference lab arrangement with Putnam. *Community Title Co.*, 796 S.W.2d at 372. "'Absence of justification' means the absence of any legal right on a defendant's part to take the actions about which plaintiff complains." *Howard v. Youngman*, 81 S.W.3d 101, 115 (Mo. Ct. App. 2002). The defendants agreed to serve as the reference lab for an in-network hospital under an arrangement in which the lab would be responsible for performing tests and the hospital for billing and collecting. Gertz and Blake were unsuccessful with requests for a copy of the Anthem-Putnam contract but accepted the representation of the hospital's attorney—whom Blake understood to be an experienced healthcare fraud investigator—that the arrangement would be compliant with insurer contracts.

---

district court explained that for tort liability the defendant must have knowledge of the insurer's particular contractual interests, which differs materially from mere knowledge that health insurers and hospitals have contracts:

> Unlike an employment contract with readily apparent interests of the parties, contracts between insurance companies and hospitals may include a variety of terms that could reflect the parties' interests … Knowledge that an existing contract might have certain terms is not enough to satisfy the intent component of tortious interference unless the Lab Defendants were substantially certain that interference would result from their actions with the Hospitals.

*Id.* at 363-64.

Appellate Case: 22-3457    Page: 66    Date Filed: 06/12/2023 Entry ID: 5285817

There was no evidence capable of establishing that Gertz and Blake failed to make reasonable inquiry into the Anthem-Putnam contract in general or its pass-through billing provisions in particular, that they intentionally interfered with or induced a breach of that contract, or that they misrepresented a single fact to Anthem or to Putnam. Anthem failed to satisfy its burden of proving that the defendants had no right to serve as Putnam's reference lab on those terms.

Appellate Case: 22-3457    Page: 67    Date Filed: 06/12/2023 Entry ID: 5285817

**V.    The District Court plainly erred in giving Plaintiffs' second alternative fraud instruction because the instruction grossly misstated Missouri law.**

### Standard of Review

This Court reviews unpreserved instructional error for plain error. *Olsen as Tr. for Xurex, Inc. v. Di Mase*, 24 F.4th 1197, 1204 (8th Cir. 2022). Under that standard, the appellant "must show that an obvious error in the jury instructions affected his substantial rights and that the error seriously affected the integrity, fairness, or public reputation of judicial proceedings." *Id.*; *see* Fed. R. Civ. P. 51 "Plain error" review under Rule 51 is suited to correcting obvious instances of injustice or misapplied law. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256 (1981).

### Argument

In reviewing the propriety of jury instructions, this Court determines whether they fairly and adequately state the law and will not find error "simply because they are technically imperfect or are not a model of clarity." *Quigley v. Winter*, 598 F.3d 938, 950 (8th Cir. 2010).

Plaintiffs submitted their fraud claim to the jury in three variants. App.1545-56; R. Doc. 760, at 28-39. The third variant—labeled "Claim One, Alternative Two"—was submitted using this instruction:

58

In the alternative, your verdict on Plaintiffs' claim for **Fraud**

must be for Plaintiffs and against [Defendant] if you believe:

*First*, [Defendant] accepted the proceeds of fraud, and

*Second*, [Defendant] had knowledge of the misrepresentations

or concealment by which the proceeds of the fraud were obtained, and

*Third*, [Defendant] did not disclose to Plaintiffs the

misrepresentations or concealment by which the proceeds of the fraud

were obtained.

App.1553-56; R. Doc. 760, at 36-39 (Instruction Nos. 31-34) (emphasis in

original).

## A.    The Error in the Instruction Is Obvious

The instruction is obviously erroneous because it does not require the jury to

find any of the essential elements of fraud. In Missouri, a submissible case of

fraudulent misrepresentation requires proof of nine elements:

> (1) a misrepresentation; (2) its falsity; (3) its materiality; (4) the
> speaker's knowledge of its falsity or ignorance of its truth; (5) the
> speaker's intent that it should be acted on by the person in the manner
> reasonably contemplated; (6) the hearer's ignorance of the falsity of
> the representation; (7) the hearer's reliance on the representation
> being true; (8) the hearer's right to rely thereon; and (9) the hearer's
> consequent and proximately caused injury.

*Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007).

When a fraud claim is predicated on nondisclosure or concealment, the defendant's

59

"silence in the face of a legal duty to speak replaces the first element: the existence of a representation." *Id.*[23]

The instruction fails on the most fundamental level—it does not "hypothesize the facts essential to the plaintiff's claim." *Hervey v. Missouri Dep't of Corr.*, 379 S.W.3d 156, 160 (Mo. 2012) (explaining that "[t]he purpose of the verdict directing instruction is to hypothesize propositions of fact to be found or rejected by the jury"). The degree to which Anthem's fraud instruction deviates from Missouri common law fraud is stunning.

*First*, the instruction conferred an extraordinary roving commission on the jury by assuming several of the elements of fraud.[24] Most glaringly, the instruction intimates that fraud has been committed by its repeated reference to "the proceeds of the fraud." In the second and third subparagraphs, the instruction assumes some unspecified fact has been misrepresented or concealed, which allowed the jury to decide what evidence might suffice. The third subparagraph posits that Defendants were under a duty to disclose rather than requiring the jury to find such a duty existed. *See Hess*, 220 S.W.3d at 765 (a duty to speak arises where one party has

---

[23] Missouri does not recognize fraudulent nondisclosure as a separate tort. *Hess*, 220 S.W.3d at 765.

[24] "'[A] roving commission occurs when a single instruction assumes a disputed fact or submits an abstract legal question that allows the jury to roam freely through the evidence and choose any facts which suit its fancy or perception of logic to impose liability." *Bauer v. Curators of Univ. of Missouri*, 680 F.3d 1043, 1046 (8th Cir. 2012) (cleaned up).

superior knowledge or information that is not reasonably available to the other); *Lowdermilk v. Vescovo Bldg. & Realty Co*., 91 S.W.3d 617, 623 (Mo. Ct. App. 2002) (submitting to the jury the issue of defendant's superior knowledge).

*Second*, the instruction omits elements essential to a finding of fraud. The instruction did not require the jury to find reasonable reliance by Anthem. *See Keefhaver v. Kimbrell*, 58 S.W.3d 54, 60 (Mo. Ct. App. 2001) (plaintiff "must show that the undisclosed information was beyond her reasonable reach and not discoverable in the exercise of reasonable diligence"). Nor did it require a finding that Anthem sustained damages proximately and consequently caused by Defendants' conduct specifically or by the alleged fraud in general.

The error is evident: The instruction did not submit an alternative variant of fraud but an alternative to fraud altogether. It authorized the jury to return a verdict for fraud without concluding that Defendants (or anyone else) concealed or misrepresented a material fact or that Anthem sustained damages on that account. Submitting an instruction that assumes or omits a disputed fact is rank error. *Hervey*, 379 S.W.3d at 160; *Williams v. Enochs*, 742 S.W.2d 165, 168 (Mo. 1987).

## B. The erroneous instruction affected the defendants' substantial rights and undermined the integrity and fairness of judicial proceedings.

Defendants' substantial rights will be harmed if the substantial fraud judgment is allowed to stand as a result of this singularly inadequate and

Appellate Case: 22-3457    Page: 71    Date Filed: 06/12/2023 Entry ID: 5285817

misleading instruction. Reversal for plain error is proper when an instruction "caus[ed] the jury to act in complete ignorance of, or to have misapplied, fundamentally controlling legal principles to the inevitable prejudice of an aggrieved party." *Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711, 724 (4th Cir. 2021) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1399 (4th Cir. 1987)). The defendants' substantial rights will be further damaged by the stigma associated with being adjudicated liable for fraud.

Permitting this error to go uncorrected will undermine the fairness and integrity of judicial proceedings. The doctrine of plain error exists to correct this type of fundamental and prejudicial error. *Id.* (reversing for plain error where instruction omitted legal definition of "willfulness" because it allowed the jury to "act in complete ignorance of fundamentally controlling legal principles") (cleaned up).

The judgment on the second alternative fraud claim should be reversed.

Appellate Case: 22-3457     Page: 72     Date Filed: 06/12/2023 Entry ID: 5285817

**VI.** **If the claims for fraud and tortious interference with a contract are reversed, the judgment on the civil conspiracy claims must also be reversed because those claims were predicated on liability for at least one of the other torts.**

Anthem submitted claims for civil conspiracy against each of the defendants. App.1561-64; R. Doc. 760, at 44-47 (Instruction No. 39-42). In Missouri, civil conspiracy is not a separate and distinct action but "acts to hold the conspirators jointly and severally liable for the underlying act." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. 2012). A claim for civil conspiracy is not actionable if the underlying tort claim fails. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. 1999).

The civil conspiracy instructions posit the fraud and tortious interference claims as underlying torts. The instructions require each Defendant and at least one alleged co-conspirator to have agreed to "engage in fraud (*as submitted in any of instructions 23, 27, and 31*), and/or tortiously interfere with [Putnam's network contract] (*as submitted in Instruction 35*)" and to have "carried out that agreement." App.1561-64; R. Doc. 760, at 44-47 (emphasis added). As charged, the jury could not return a verdict for Anthem on the civil conspiracy claims unless it found Defendants committed fraud or tortiously interfered with Putnam's network contract.

Accordingly, in the event this Court reverses the judgment entered on the claims for fraud and tortious interference with a contract, the judgment for civil

63

conspiracy should also be reversed. *Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 700 (8th Cir. 2002) ("Deutsche cannot prevail on its claim for civil conspiracy where the underlying tort claim fails.").

Appellate Case: 22-3457    Page: 74    Date Filed: 06/12/2023 Entry ID: 5285817

**VII. The District Court plainly erred in entering judgment for Anthem on the claims for money had and received in the amount of $18,053,151 because such damages were excessive and were not supported by the evidence.**

### Standard of Review

An unpreserved claim that damages are excessive is subject to plain error review. *Simco v. Ellis*, 303 F.3d 929, 933 (8th Cir. 2002). Under the plain-error standard of review, this Court will reverse if the amount of damages is so disproportionate that it would be a miscarriage of justice to affirm it. *Id*.

### Argument

Anthem submitted claims for money had and received against Defendants. App.1565-68; R. Doc. 760, at 48-51 (Instructions 43-46). A claim for money had and received requires proof that: (1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust. *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 898 (8th Cir. 2014) (citing *Ward v. Luck*, 242 S.W.3d 473, 476 (Mo. Ct. App. 2008)). The damages assessed against Defendants for money had and received is thus capped at the amount of Anthem's money that they received from Putnam. *Id*.

Anthem reimbursed Putnam $18,053,015 for all claims Putnam submitted for blood tests performed by SeroDynamics. T5A/1053,1059. Anthem, however, did not put on any evidence establishing how much of that sum Putnam went on to

65

pay Defendants. Karen Fortune, Anthem's damages expert, testified that Anthem paid the entire $18 million to Putnam and that these funds were deposited in the hospital's bank account. T5A/1063. She agreed Putnam did not transfer all those funds to Defendants. T5A/1066. Putnam used some of that money to pay its employees. *Id*. Anthem offered the jury no alternative calculation of damages.[25]

A claim for money had and received is "founded upon an implied contract created by law." *Karpierz v. Easley*, 68 S.W.3d 565, 570 (Mo. Ct. App. 2002). "A party claiming damages for breach of contract bears the burden of proving the existence and amount of damages with reasonable certainty." *Delgado v. Mitchell*, 55 S.W.3d 508, 512 (Mo. Ct. App. 2001). "Proof of actual facts which present a basis for a rational estimate of damages without resorting to speculation." *Id*.

The damages evidence Plaintiffs offered in support of the money had and received claims does not come close to meeting this standard. It provided the jury with no basis for ascertaining how much Defendants received of the $18 million Anthem paid to Putnam. Anthem had this information at its disposal and decided not to present it to the jury. Anthem's attorney told the court that he "didn't put on

---

[25] In a sidebar conference during Ms. Fortune's cross-examination, Anthem's counsel confirmed that Ms. Fortune's damages calculation of $18 million represented the money Anthem paid to Putnam: "[T]hese are the damages to Blue Cross, not these are the benefits to defendants, right? There's a distinction there…. The benefits to the defendants when we're in the ERISA trial, that's what we got to talk about. But here it's the damages to the plaintiffs for the defendants' conduct. That's what she testified to." T5A/1065.

Appellate Case: 22-3457     Page: 76     Date Filed: 06/12/2023 Entry ID: 5285817

anything about the [funds] tracing analysis" during Ms. Fortune's direct examination because, in his view, it was relevant only to the ERISA claim which was not being tried to the jury. T5A/1064. He was wrong. The evidence was essential to prove damages for the money had and received claim. Without it the jury had no way to determine the amount of Anthem's money Defendants received. *See Cent. Coal & Coke Co. v. Hartman*, 111 F. 96, 97 (8th Cir. 1901) (recognizing that "[s]peculative, remote, or contingent damages cannot form the basis of a lawful judgment").

The District Court plainly erred in entering an eight-figure judgment against Defendants on the money had and received claims. The damages award is a miscarriage of justice because it grants a legally unjustifiable windfall to Anthem. The judgment on the money had and received claim should be reversed and the case should be remanded for a new trial.

Appellate Case: 22-3457     Page: 77     Date Filed: 06/12/2023 Entry ID: 5285817

**VIII**. **If this Court reverses the judgment on tort claims that served as a predicate for the submission of punitive damage, the punitive damages award premised on those claims must be reversed.**

In the event this Court reverses the judgment as to Plaintiffs' claims for fraud, tortious interference with a contract, and civil conspiracy, the punitive damage awards must be reversed as well.

As instructed, the jury was authorized to award punitive damages based the verdicts on the claims for fraudulent misrepresentation, tortious interference with a contract, and civil conspiracy. App.1580-81; R. Doc. 760, at 63-64.[26] The failure of Plaintiffs' predicate tort claims mandates the reversal of the punitive damage awards. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 526 (Mo. Ct. App. 2007) ("Because Plaintiffs failed to prove an underlying cause of action that could support a punitive damages award, the award of punitive damages in the judgment must be reversed.").

Accordingly, if predicate tort claims for submitting punitive damages are reversed, this Court should reverse the punitive damages awards.

---

[26] Anthem elected not rely on the verdict on its second alternative fraud claim as a basis for submitting punitive damages. T7/1306-10. Anthem also did not submit punitive damages on the money had and receive claim either, acknowledging exemplary damages are not recoverable for such claims. T7/1306; *see Hilderbrand v. Anderson*, 270 S.W.2d 406, 410 (Mo. Ct. App. 1954).

Appellate Case: 22-3457     Page: 78     Date Filed: 06/12/2023 Entry ID: 5285817

# CONCLUSION

This Court should reverse the judgment for the reasons set forth in this brief. The case should be remanded to the District Court with instructions in accordance with this Court's decision.

Respectfully submitted,

/s/ Joseph F. Yeckel (Mo. 45992)
Yeckel Law Firm LLC
8909 Ladue Rd.
St. Louis, Missouri 63124
 (314) 727-2430
joe@yeckel-law.com

Michael Gross (Mo. (Mo. 23600)
Michael Gross Law Office
6350 Clayton Road, Unit 306
St. Louis, Missouri 63117
(314) 863-5887
mgross@grossbriefs.com

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's order dated May 1, 2023, because the brief is 14,900 words, excluding the items excluded under Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365, in 14-point Times New Roman.

Pursuant to Local Rule 28A(h)(2), I certify that the Brief and the Addendum have been scanned for viruses and are virus-free.

/s/ Joseph F. Yeckel

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 5, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Joseph F. Yeckel

Appellate Case: 22-3457    Page: 80    Date Filed: 06/12/2023 Entry ID: 5285817